William POOLE, Wilfred Lee Mungro, and PBA Local 105, an unincorporated labor organization, Plaintiffs,

v.

Robert E. STEPHENS, individually and as Superintendent of Northern State Prison; William Fauver, individually and in his capacity as Commissioner of the New Jersey Department of Corrections; Gary Hilton, individually and as Assistant Commissioner of the Department of Corrections; Thomas Cooper, individually and as Director of the Corrections Officer Training Academy; New Jersey Department of Corrections, a principal department of state government, Defendants.

Civ. A. No. 88–620.

United States District Court,
D. New Jersey.

May 16, 1988.

Robert A. Fagella, Zazzali, Zazzali & Kroll, Newark, N.J., for plaintiffs.

W. Cary Edwards, Atty. Gen. by Carl A. Wyhopen and Joseph T. Maloney Deputy Attys. Gen., Div. of Criminal Justice, Trenton, N.J., for defendants.

## OPINION

BISSELL, District Judge.

The assertions in the preliminary and jurisdictional statements of plaintiffs' Verified Complaint provide the setting for this matter:

## I. PRELIMINARY STATEMENT

1. This action arises under the United States Constitution, particularly the Fourth, Ninth and Fourteenth Amendments, the New Jersey State Constitution, Article One, Paragraph Seven, and under the laws of the United States, particularly 42 U.S.C. § 1983, § 1985, and § 1988, which provide for remedies in federal court to redress the deprivation of the plaintiffs' rights to due process of law, freedom from unreasonable search and seizure, their rights to privacy and their entitlement to the equal protection of law.

2. Specifically, plaintiffs are corrections officers, corrections officer recruits and the labor organization representing both classes of individuals employed by the New Jersey Department of Corrections as corrections recruits and corrections officers. They contest the recently promulgated policy of defendants concerning "drug testing" of individuals holding such positions, which will become effective February 6, 1988. They submit that the policy violates their rights by requiring mandatory and random analysis of the urine of all corrections recruits without either probable cause or other individual suspicion; by refusing to provide reasons to those individuals about whom "individual reasonable suspicion" allegedly exists to justify production of a urine sample; and by promulgating a policy which violates their rights to privacy, due process and to equal protection of the law by being both highly intrusive and grossly underinclusive through its arbitrary failure to apply the same procedures to similarly situated persons.

## II. JURISDICTION

3. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202. The matter in controversy exceeds in value, exclusive of interest and costs, the sum of $10,000.00.

For the purposes of this proceeding, the parties stipulated the following facts, to which this Court by footnote here added some additional related findings.

1. William Poole resides at 761 South 20th Street, Newark, New Jersey. He is a corrections officer recruit employed at Northern State Prison in Newark. He has held this position since 1987. At the time of the filing of this complaint he was enrolled in the Corrections Officer Training Academy.

2. Wilfred Lee Mungro is a senior corrections officer employed at Northern State Prison in Newark. He has been so employed since on or about 1982.

3. PBA Local 105 is an unincorporated labor organization which is the collective bargaining agent for approximately 4,500 senior corrections officers and corrections officer recruits employed at state penal institutions throughout the State of New Jersey.

4. Robert E. Stephens is the Superintendent of Northern State Prison, a maximum security penal institution located in Newark, New Jersey. In this capacity he is responsible for the overall operation, custody and control of inmates housed there and supervision of all corrections officers employed there, and for the enforcement of the Department of Corrections drug testing policy at Northern State Prison.

5. William Fauver is the Commissioner of the New Jersey Department of Corrections. In this capacity he has overall responsibility for the operation of all state correctional institutions throughout New Jersey.

6. Gary Hilton is an Assistant Commissioner of the Department of Corrections for adult institutions such as Northern State Prison. In this capacity he has substantial involvement in the preparation and promulgation of personnel policies affecting all corrections officers.

7. Thomas Cooper is the Director of Corrections Officer Training Academy (COTA).

8. The New Jersey Department of Corrections is a principal department of State Government with offices at Whittlesey Road in Trenton. It is charged by statute with the effective operation of all minimum, medium and maximum security penal institutions operated by the State of New Jersey.

9. As of April 4, 1988, the total number of corrections officers within the Department of Corrections was 3,706.

10. As of April 4, 1988, the total number of corrections officer recruits within the Department of Corrections was 783.

11. As of April 4, 1988, the total number of non-custodial employees within the Department of Corrections was 3,611, 64 of whom are in the office of internal affairs.

12. On or about January 7, 1988, William H. Fauver issued a memorandum policy addressed to all custody staff members entitled "Procedures For Drug Screening Permanently Appointed Corrections Officers and Supervisors, Internal Affairs Investigators and Supervisors and Corrections Officer Recruits", scheduled to become effective on or about February 6, 1988.[1]

13. The drug testing policy of the Department of Corrections specifically applies to corrections officers and supervisors, Internal Affairs investigators and supervisors and corrections officer recruits.

14. The following categories of employees are not included in the drug testing policy: superintendents and assistant superintendents of the institutions, institutional trade instructors, vocational or academic teachers, social workers, doctors, nurses.

15. Corrections officer recruits are regularly appointed employees who hold that position up to 12 months before they assume the position of corrections officer. They are deemed law enforcement personnel.

16. Corrections officer recruits are first assigned to an institution before receiving training at the Corrections Officer Training Academy.

---

1. A copy of that memorandum policy is attached to this Opinion as Exhibit A. The forms developed for the implementation of that policy are reasonably calculated to insure that the procedural requirements are met. *See e.g.*, Exhibits J-65 through 73.

17. Although at present it is the Department of Corrections' policy to send a recruit to COTA within one year of appointment, a number of corrections officer recruits and corrections officers have worked for more than a year at the various institutions before they were sent to COTA for training.

18. While at COTA, corrections officer recruits do not have any contact or involvement with inmates.

19. All applicants for positions of corrections officer recruits must first pass a drug test at the time of their application for the position. A negative test result is a prerequisite to appointment as a corrections officer recruit.

20. It is the intention of the Department of Corrections to test corrections officer recruits more than once while at the COTA, without any individualized reasonable suspicion to suspect drug usage.

21. Effective January 4, 1988, the duration of the basic training course for corrections officers conducted at the Corrections Officer Training Academy has been expanded from six to eight weeks.

22. The typical basic training class attending the Corrections Officer Training Academy consists of approximately 200 participants.

23. Scientific procedures utilized under the drug testing policy of the Department of Corrections are calibrated to detect the presence of the following substances in urine: amphetamines, barbituates, cocaine, marijuana, opiates.

24. The drug testing policy by its terms does not compel or forbid that the underlying factual basis for a drug testing order to a corrections officer be revealed at the time the order is issued. It is the present intention of the Department of Corrections not to reveal the underlying factual basis for a drug testing order at the time such order is issued.

25. It is the present intention of the Department of Corrections to reveal the underlying factual basis for a drug testing order only to the extent it may be required in a disciplinary or grievance proceeding.

26. A refusal by any officer to submit to a drug test will result in dismissal, subject to a hearing.

27. A positive test result will result in dismissal subject to a hearing.

28. The Department of Corrections will determine whether it will forward information regarding a positive test result to a criminal law enforcement agency on a case-by-case basis.

29. When an officer is ordered to produce a urine sample for drug testing based on individualized reasonable suspicion, that officer will be placed on administrative leave with pay pending an analysis, including any necessary confirmatory analysis of the sample. If the urine sample tests positive for the presence of an illegal substance based on confirmatory testing procedures, subject to a "Loudermill" hearing, the officer will be suspended without pay pending the completion of a departmental disciplinary hearing for termination of employment.[2]

30. Since implementation of the Department's drug testing policy, as of March 31, 1988, there have been 11 orders to submit urine samples for drug testing based on individualized reasonable suspicion. These orders resulted in the following:

| | |
|---|---|
| Positive results | 3 |
| Negative results | 1 |
| Refused order to submit sample | 6 |
| Refused to report to duty and resigned | 1 [3] |

31. Information supplied by the Employee Advisory Service of the New Jersey Department of Personnel indicates that during the current fiscal year there are a number of corrections officers enrolled in the drug rehabilitation program.

---

2. If that disciplinary hearing results in a decision adverse to the officer, he has a right to a hearing *de novo* before an Administrative Law Judge and rights of appeal from any decision at that hearing.

3. As of the date of trial, April 14–15, 1988, shortly after the stipulation was entered into, there had been 13 orders to submit such urine samples.

32. The National Institute on Drug Abuse has reported a survey which indicates: 19% of Americans over 12 years of age have used illicit drugs in the past year; 65% of Americans between 18 and 25 years old have used illicit drugs; 44% of Americans between 18 and 25 years have used illicit drugs in the past year.

On February 11, 1988, this Court issued a temporary restraining order precluding the random testing of recruits or corrections officers at COTA. Those restraints have continued to the present. All claims in this action against the defendant New Jersey Department of Corrections and any claims for money damages against all defendants were (upon defense motions) dismissed by this Court by Order dated April 5, 1988. A consolidated hearing for preliminary injunction and trial upon the merits was conducted on April 14 and 15, 1988. Fed.R.Civ.P. 65(a)(2).

In addition to the stipulated facts, the Court makes the following findings of fact material to its decision in this case:

33. More frequently than not, recruits are sent to COTA promptly after they are hired. Corrections Officer Samuel Love was sent there about two months after he was hired. Plaintiff William Poole, a recruit, began his term at COTA approximately one week after reporting for duty in January 1988. At COTA, recruits are not exposed to the inmate population, nor are they required to live there although they may if they choose to. Most recruits are in their early twenties, the age group where illicit drug use is the most prevalent. Because of their limited time in service, recruits at COTA have little in the way of employment history within the Department of Corrections, and are relatively unknown to the trainers, supervisors and administrators in the department. Drug dependency often develops in response to stress that the user is unable to cope with in other ways. The duties and environment to which a COTA recruit will soon be exposed as a corrections officer in a prison frequently generate levels of extreme frustration and stress for an officer. It is reasonable and necesary to identify (to the fullest extent possible) those persons who, even in response to influences less stressful than those encountered by a corrections officer, have resorted to illegal drug use. Testing of urine samples randomly taken from recruits at COTA is reasonably calculated to achieve that important goal.

34. Within prison walls, only corrections officers and recruits who have completed COTA can be issued firearms. Those who perform transportation, outside tour, fugitive pursuit or tower guard duty do carry such weapons. The persons listed in stipulated paragraph 14 above are often in close contact with prisoners, and the institutional trade instructors often handle power tools and equipment which if misused by such a person under the influence of illegal drugs could pose a danger to others and to security and good order in that area of the prison. The corrections officers, however, run the prisons, and they alone respond to inmate disturbances and incidents (at which time they are sometimes armed from the prison arsenal). No "civilian" working in the prisons is subject to the same stresses provoked by inmate contact as are corrections officers. They are the most vulnerable to drug trafficking with prisoners and such unsavory results as favoritism, confrontations, debts, extortion and blackmail. The prison inmate population is both capable and inherently inclined to engage in such compromising conduct with corrections officers if given the chance. The opportunity and incentive for prisoners to engage in such conduct with civilian employees of the Department of Corrections is much less than it is with their guards and captors.

35. Information indicating that a corrections officer is suspected of using drugs can come from a number of sources under circumstances where confidentiality should be preserved. These sources include inmates, civilian employees within the prison, supervisors, other corrections officers, other law enforcement agencies, family members and acquaintances of the officer under suspicion. Other types of internal investigations of corrections officers are conducted by the Department of Corrections without the officer being advised of it at the

outset. The *Loudermill* hearing, conducted as the first step in the hearing procedure available to a corrections officer, does not include the revelation of the source of the reasons for the individualized suspicion, nor is it constitutionally required at that stage. *See Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 545–46, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). If and when directed by a departmental hearing officer or Administrative Law Judge to reveal such sources to the officer, the Department of Corrections does so.

36. Voiding the urine sample either in the presence of the monitor or in private only after having stripped in the monitor's presence is predictably embarrassing considering that urination is normally performed under conditions of privacy. Henceforth, however, every applicant for a position as a corrections officer has notice of the drug testing requirements, both at COTA and in the prison setting, to which he will be subject.

37. At COTA recruits receive training in firearms on a 22–man firing range without barriers between the stalls. Recruits practice and then attempt to qualify in proficiency with sidearm, rifle and shotgun. Approximately 50% of the recruits are using firearms for the first time. This training on the firing range begins in about the sixth week of the COTA course, and only after classroom training about these firearms. Shooting is done in various positions at various distances from the targets, and some of it is conducted in the dark. There are no comparably-sized ranges and no programs conducted with this intensity at any of the prisons themselves. Senior corrections officers to be requalified in firearms do so at COTA annually. Despite the fact that as many as ten instructors may be on duty at the COTA range during its use, an undetected drug abuser firing on that range would pose a substantial threat to the safety of others in that area.

38. Recruits also receive intense, condensed training in many other subjects, both mental and physical at COTA, including the use of weapons other than firearms. Attentiveness, alertness and physical fitness (all of which are imperiled by drug abuse) are important to the successful completion of these phases of their training.

### THE ISSUES

Three claims require adjudication by the Court:

(1) May the defendants conduct random testing of recruits at COTA without violating their rights to equal protection of the laws and to freedom from unreasonable searches and seizures?

(2) Are the corrections officers' rights of due process violated when they are ordered to submit to drug testing upon reasonable individualized suspicion but at that moment are not advised of the reasons or the sources thereof.

(3) Are the corrections officers' rights to equal protection of the laws violated by the policy which subjects them to drug testing based upon reasonable individualized suspicion but does not impose such a requirement upon other Department of Corrections employees working in contact with inmates within prison walls?

I. *Random Drug Testing of Recruits at COTA, Fourth Amendment Issue:*

Drug testing programs of law enforcement personnel and persons employed in other sensitive and/or heavily regulated occupations have been subject to constitutional review in numerous United States District and Circuit Courts in recent years. Without pretending to be exhaustive, Exhibit B hereto is a list of such decisions considered by this Court in adjudicating the present action. For ease of presentation, in the course of this opinion several of those decisions will be referred to without repeated full citation. Additionally, since these opinions discuss at length those which preceded them, I will spare the present parties a detailed review of the facts and holdings of most of those cases.

The fourth amendment protects our citizens "against unreasonable searches and seizures." It is no longer debatable that the taking of a urine specimen for the

purpose of performing a test to reveal drug usage is a "seizure" within the scope of the fourth amendment. The mixed question of fact and law for the Court to resolve is whether the random testing of the recruits at COTA is, under all the attendant circumstances, constitutionally "unreasonable." If not, whatever might be its other shortcomings, no fourth amendment claim may be predicated upon that policy.

With one exception (*Railway Labor v. Burnley*), no circuit court authority cited to this Court has declared a particular drug urinalysis policy based other than upon reasonable individualized suspicion violative of the fourth amendment rights of a person to be tested.[4] *See Shoemaker v. Handel, McDonnell v. Hunter, National Treasury Employees Union v. Von Raab, Rushton v. Nebraska Public Power District* and *Jones v. McKenzie.* Some district courts have reached the same result. *See Transport Workers Local 234 v. SEPTA* and *Rushton.* Throughout these cases runs a common thread that the particular job to be performed by the employee is the critical factor that tips the balance of rights in favor of the reasonableness of a random (or similar) urinalysis testing program. This Court determines that newly employed corrections officers (recruits) are so similarly situated to jockeys (*Shoemaker*), customs agents exposed to drugs and weapons (*Von Raab*), school bus drivers and attendants (*Jones*), train operators (*SEPTA*), and nuclear power plant workers (*Rushton*), that it is constitutionally reasonable to require their random testing under the specific policy promulgated on January 7, 1988. Indeed in *McDonnell*, random urinalysis of corrections officers on duty in medium and maximum security prisons withstood constitutional attack. The court states succinctly in *McDonnell:*

> We believe the state's interest in safeguarding the security of its correctional institutions is at least as strong as its interest in safeguarding the integrity of, and the public confidence in, the horse

racing industry [referring to *Shoemaker*].

809 F.2d at 1308.

The New Jersey Bureau of Corrections has chosen a program designed to minimize the likelihood that drug abusers will go on full-time duty in the prisons by identifying these persons before they have served any considerable time within prison walls. Balancing the public interests, particularly those related to COTA training and the prison environment, as related in the findings of fact above, against the acknowledged invasion of the recruits' privacy by means of the manner in which the urinalysis is randomly ordered and thereafter conducted, this Court finds that the recruits are not thereby subjected to "unreasonable searches and seizures" in violation of the fourth amendment. Recruits are aware of the peculiar circumstances and demands of the occupation for which they are training and the imperative need that persons with a weakness for drug abuse not serve as corrections officers in the prison setting. Therefore, recruits, like jockeys, must be deemed to have "reduced ... justifiable privacy expectations" regarding their training situation. *Shoemaker*, 795 F.2d at 1142. Because of the prison setting for which they are being trained, and the frustrations, stresses and influences that will be exerted against them there, the present plaintiff recruits are not situated similarly to the fire department and police department personnel included in the *Capua* and *Washington Township* cases. Furthermore, *Capua* involved a mass testing "raid" clearly not present in the case at bar, and *Washington Township* is presently on appeal to the United States Court of Appeals for the Third Circuit, the author of *Shoemaker*. Additionally, the random testing imposed at COTA is hardly onerous. No argument can be made that recruits will be subjected to prolonged, indefinite anxiety from this program: the entire training session is only eight weeks long. With two hundred or more recruits in a class, the forecast is that a recruit will be called upon approximately twice for ran-

---

4. *Burnley* drew a vigorous dissent by Judge Alarcon, consistent with other circuit precedent, which this Court finds to be much the better reasoning.

dom urinalysis at COTA. Finally, the promulgated policy is certain, particularized in its procedures and well calculated to preserve the integrity of the sample, to protect the due process rights of the persons tested and to insure accurate test results within the confines of present scientific techniques. Judgment is entered for the defendants upon plaintiff's fourth amendment claim.[5]

## II. Equal Protection Arguments

Two equal protection arguments are implicated in the present action: (1) why should recruits be tested at random when corrections officers are only tested upon reasonable individualized suspicion, and (2) why are not the "civilian" employees in regular contact with inmates also tested upon reasonable individualized suspicion?

The Third Circuit has recently reiterated the standard to be applied to equal protection arguments:

We next address the plaintiffs' argument that they have been denied equal protection of the law. The plaintiffs rightly refrain from contending that their equal protection claim is entitled to strict or heightened scrutiny; accordingly, we will apply the "general rule ... that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439–40 [, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313] (1985). *See Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313 [96 S.Ct. 2562, 2566, 49 L.Ed.2d 520] (1976) (holding rational basis standard appropriate for analyzing claim of unconstitutional deprivation of public employment, where no fundamental right or suspect class is concerned); *see also United Bldg. & Constr. Trades Council of Camden v. Mayor of Camden,* 465 U.S. 208, 219 [104 S.Ct. 1020, 1028, 79 L.Ed.2d 249] (1984) (stat-

ing that "there is no fundamental right to government employment for purposes of the Equal Protection Clause"). The plaintiffs bear the burden of proof on this issue, and so must show that the requirements imposed by law or regulation "so lack rationality that they constitute a constitutionally impermissible denial of equal protection." *Rogin v. Bensalem Township,* 616 F.2d 680, 688 (3d Cir.1980), *cert. denied* 450 U.S. 1029 [101 S.Ct. 1737, 68 L.Ed.2d 223 (1981)]. In considering this issue, we bear in mind the Court's statement that a statute or regulation should not be overturned on equal protection grounds "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley,* 440 U.S. 93, 97 [99 S.Ct. 939, 943, 59 L.Ed.2d 171] (1979).

*Anderson v. City of Philadelphia,* 845 F.2d 1216, 1222–23 (3d Cir.1988). The same analysis is applied to regulations with the force of law, such as the January 7, 1988 policy.

(1.) As noted in the findings of fact set forth above, the recruits at COTA and the corrections officers within prison walls are engaged in different activities in different settings. Recruits at COTA, less well-known to their trainers and supervisors, are subjected to multifaceted, intense, condensed training in an eight-week time span. In the later weeks of the course the trainees are on the firing range where 50% of them have never fired weapons before. Ability to absorb all aspects of training and to act in such a way as not to endanger themselves and others mandate that the recruits at COTA be physically sound and alert. Furthermore, it is reasonable and rational for the Department of Corrections to employ random testing at COTA to detect and weed out drug abusers from those who will go on to run the prisons; and

---

**5.** Plaintiffs plead a violation of the penumbral right to privacy (*see Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) and *Roe v. Wade,* 410 U.S. 113, 93 S.Ct.

705, 35 L.Ed.2d 147 (1973)). *Shoemaker* (795 F.2d at 1144) and *Burnley,* (839 F.2d at 591–92) defeat this argument also.

equally reasonable and rational for the department to conclude that those who have passed random urinalysis at COTA need only be tested upon reasonable individualized suspicion thereafter. While different testing patterns or comparisons between recruits at COTA and corrections officers might be defended with equal or even greater logic, the classification selected by the Department of Corrections in the present case passes the equal protection standard set forth in *Anderson* and the authorities cited therein.

(2.) The equal protection argument advanced by the corrections officers regarding the fact that "civilians" within the prisons are not included in the January 7, 1988 drug testing policy is one of "underinclusion." A similar argument was raised by the plaintiffs in *Shoemaker* and rejected by that court.

The jockeys point out that, while all jockeys must submit to a daily breathalyzer test, officials, trainers, and grooms are not subjected to daily testing and that only the jockeys are currently subjected to random selection for the urine testing. Relying on *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), they contend that such selective enforcement denies jockeys the equal protection of the laws.

\*　　\*　　\*　　\*　　\*　　\*

The governing equal protection principle is that the state may rationally take one step at a time. *See, e.g., Williamson v. Lee Optical, Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955) ("Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."); *Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 110, 69 S.Ct. 463, 465–66, 93 L.Ed. 533 (1949) ("It is no requirement of equal protection that all evils of the same genus be eradicated or none at all."). Thus we find no merit in the jockeys' equal protection challenge.

795 F.2d at 1143, 1144. This Court infers from the evidence that the Department of Corrections may well choose in the future to expand its drug testing program to civilian employees who come into contact with inmates in the prisons. However, as set forth above in this Court's findings, the corrections officers are in a position, and may be placed in a variety of stressful situations, unlike those to be confronted by other employees. Strong arguments could be made to test instructors handling potentially dangerous equipment or medical personnel who handle drugs. But even those employees are not in the same position, particularly with regard to relationships and contact with prisoners as are the corrections officers. Whether considered as a final decision (*Anderson* analysis) or one in a series of anticipated steps (*Shoemaker*), the Department of Corrections' policy for urinalysis of corrections officers but not "civilians" within the prisons does not violate equal protection standards.

III. *Due Process in Ordering a Corrections Officer to Submit to Urinalysis Based upon Reasonable Individualized Suspicion.*

 This Court noted in its findings the legitimate bases for the Department of Corrections' desire to preserve confidentiality of the particular reasons and information sources underlying an order to a corrections officer to submit to drug urinalysis. Fear of retaliation and the chilling effect which that may have upon prisoners and other corrections officers revealing an officer's drug abuse are very real concerns aggravated by the confined setting of a prison. The fourth amendment principles do not require disclosure of the grounds and sources of information to one about to be subjected to an otherwise reasonable search and seizure.[6] See the similar analysis and results regarding the drug testing of inmates at Rahway State Prison expressed in *Denike v. Fauver,* Civ. 83–2737 (U.S.D.C., D.N.J. 11/30/87) (Debevoise, J.) The codified procedures, which require a

---

6. Urinalysis upon reasonable individualized suspicion *per se* is not attacked by plaintiffs in this　case, nor could it be.

158

high-level decision based upon a contemporaneous memorandum which freezes the bases for the alleged suspicion, provide protection to the corrections officers. Although source disclosure is not required at the *Loudermill* hearing, it will inevitably be required if an officer invokes his right to further, formal hearings and judicial review. These post-termination hearings satisfy due process requirements. Judgment is also entered for the defendants upon this claim of the plaintiff corrections officers.

IV. *Claims Based upon New Jersey State Constitutional Principles*

■ Plaintiffs assert as alternative grounds to their federal claims, violations of their rights against unreasonable searches and seizures under Article 1, ¶ 7 of the New Jersey Constitution plus the implied right of equal protection under that Constitution. *See Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273 (1973). It has been said in a recent decision with implications pertinent to the case at bar that the New Jersey Constitution "has often been construed, particularly in recent years, as providing greater protection to our citizens' individual rights than accorded them under the federal constitution. [Citation omitted]. In particular, our state constitution has been found to afford greater protection against unreasonable searches and seizures than may be required by the United States Supreme Court's interpretation of the Fourth Amendment. [Citations omitted]." *Fr. Order of Police v. City of Newark,* 216 N.J.Super. 461, 477, 524 A.2d 430 (App.Div. 1987). *See also Holy Name Hospital v. Montroy,* 153 N.J.Super. 181, 185, 379 A.2d 299 (1. Div.1977). Logically, therefore, this Court might be expected to proceed to adjudicate plaintiffs' search and seizure and equal protection claims based upon the New Jersey Constitution (under principles of pendent jurisdiction) because they might arguably provide just that much more protection as to tip the balance on one or more of these claims in favor of the plaintiffs. However, the Court declines to do so.

Although *Fraternal Order of Police, supra,* expressly declined to consider the "random drug testing of police trainees"

(216 N.J.Super. at 475 n. 11, 524 A.2d 430), that very issue is presently before the Appellate Division in two cases "fast-tracked" for disposition which may come as early as June 1988. *Fraternal Order of Police v. City of Newark,* No. A-2998-87T5, *appeal certified,* (App.Div. March 21, 1988) (argument scheduled June 1, 1988) (*F.O.P. II*); *Sweeney v. County of Bergen,* No. C-475-87 (N.J.Ch.Div. Jan. 7, 1988), *appeal docketed,* No. A-2632-87T5 (App.Div. Jan. 15, 1988).

While this Court believes that COTA recruits or trainees are not identical to police trainees, the similarities between them may be greater than those between full-time policemen and corrections officers. Furthermore, questions of New Jersey state constitutional law, particularly those of first impression, should be decided by that state's courts. Accordingly, this Court chooses to stay its hand in deciding the claims under the New Jersey Constitution in the case at bar, awaiting at least the adjudication of *Sweeney* or *F.O.P. II* in the Superior Court, Appellate Division. *See Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

Final judgment will be entered in favor of the defendants on the plaintiffs' claims under the United States Constitution addressed herein. A preliminary injunction against implementation of any part of the January 7, 1988 policy is denied because, having lost on their federal claims, plaintiffs have not demonstrated a reasonable likelihood of success upon the merits of those claims based upon comparable (though perhaps broader) principles of New Jersey constitutional law. Further proceedings in this Court upon those state claims are stayed pending further developments in *Sweeney* and *F.O.P. II* and/or until further order of this Court.

EXHIBIT A

January 7, 1988

MEMORANDUM

TO: ALL CUSTODY STAFF MEMBERS

ALL INTERNAL AFFAIRS INVESTIGA-
TORS AND SUPERVISORS

FR: William H. Fauver

Commissioner

RE: Procedures for Drug Screening Permanently Appointed Correction Officers and Supervisors, Internal Affairs Investigators and Supervisors and Correction Officer Recruits.

It is of paramount interest to this Department that employees who are responsible for the supervision, custody and care of inmates, and who are authorized to carry a firearm pursuant to 2C:39–6, are neither using nor under the influence of illicit drugs. Toward this end, the following drug screening procedures have been developed for use by this department. They are modeled after and incorporate the procedural safeguards of the law enforcement drug screening guidelines promulgated by the Attorney General of the State of New Jersey on October 22, 1986, and will become effective at the expiration of thirty (30) days.

POLICY

Urine samples shall be ordered taken from a permanently appointed correction officer or supervisor or an Internal Affairs investigator or supervisor whenever there is individualized reasonable suspicion to believe that the officer is using or under the influence of illegal drugs. Subsequent to appointment, correction officer recruits shall be subject to random, unannounced drug testing by urinalysis during mandatory training at the Correction Officers Training Academy. The Department recognizes the difficult task facing Correction Officer Recruits during this academy training. We want to ensure to the extent possible that recruits obtain maximum benefit from this period of training, and that they do not expose themselves and their coworkers to unnecessary hazards by being under the influence or effect of illegal substances. Upon successful completion of the COTA program correction officer recruits shall be subject to drug testing by urinalysis when there is individualized reasonable suspicion

to believe the recruit is using or under the influence of illegal drugs.

Correction officers and supervisors, Internal Affairs investigators and supervisors and correction officer recruits must disclose the use of any drugs (prescription and over-the-counter) which may impair job performance.

Correction officers and supervisors, Internal Affairs investigators and supervisors and correction officer recruits must report evidence of suspected drug use by other officers to department superiors.

Urine samples shall not be ordered from a permanently appointed correction officer or supervisor or Internal Affairs investigator or supervisor or correction officer recruit without the approval of the Commissioner, the Deputy Commissioner or the Assistant Commissioner for Adult Institutions.

SPECIMEN ACQUISITION PROCEDURE.

A urine sample shall be ordered from a correction officer or supervisor or Internal Affairs investigator or supervisor, when there is individualized, reasonable suspicion to believe that the officer or supervisor or Internal Affairs investigator or supervisor is using or under the influence of illegal drugs.

Prior to requesting that an officer or supervisor or Internal Affairs investigator or supervisor or correction officer recruit not in COTA, submit a urine sample, the department shall document the basis for reasonable suspicion and prepare a confidential report. The order to submit a urine speciman shall be given to the correction officer or supervisor or Internal Affairs Investigator or supervisor or correction officer recruit by the institution's Superintendent or designee, or in the case of Central Office custody employees, by their unit supervisor or designee, who shall document the date and time that the order was given.

The supervisor of the Correction Officers Training Academy may, with the approval of the Commissioner, Deputy Commissioner or Assistant Commissioner for Adult Institutions, order random samples taken from correction officer recruits; for exam-

ple all recruits in a particular training class, or a particular platoon or squad within a training class.

Prior to the submission of a urine sample, the officer or supervisor or Internal Affairs investigator or supervisor or correction officer recruit shall complete a medical questionnaire which shall clearly describe all drugs, both prescription and non-prescription, ingested during the past 30 days. (See Attachment B).

The institutional superintendent or unit supervisor shall designate an individual to serve as the official monitor. The officer may also name another individual (from immediately available staff) to witness the sample acquisition.

The official monitor shall be responsible for ensuring that all forms have been thoroughly and accurately completed by the officer. Prior to the submission of the sample, both the official monitor and the officer will inspect the specimen bottle for indications of pre-void tampering.

Generally, the officer or supervisor, Internal Affairs investigator or supervisor or correction officer recruit will submit the urine sample in the presence of the official monitor. On those rare occasions where the officer or supervisor, Internal Affairs investigator or supervisor, or correction officer recruit is not able to provide a sample in the presence of the official monitor, the monitor will permit the officer or supervisor, Internal Affairs investigator or supervisor or correction officer recruit to provide an unwitnessed sample, so long as the officer or supervisor, Internal Affairs investigator or supervisor, or correction officer recruit removes his clothing in the presence of the official monitor prior to entering a room where he/she has no access to water or any other additive.

The official monitor shall always be of the same sex as the individual being tested.

Our Department employs thousands of correction officers, supervisors, Internal Affairs investigators and supervisors and recruits, many of whom share similar or even the same names. In the interest of preventing any confusion or misidentification, the individual's social security number rather than name shall be utilized on all specimen bottle labels, and chain of custody and medication information forms.

The individual being tested will complete the information requested on the specimen bottle label and the laboratory chain of evidence form. After the official monitor has inspected the information for accuracy, the officer or supervisor, Internal Affairs investigator or supervisor, or correction officer recruit will void at least 50 ml. of urine into the specimen bottle; he or she will then secure the cap of the specimen bottle and initial and wrap evidence tape along the top of the bottle, along the cap and down the other side, place the specimen bottle in a plastic evidence bag prior to surrendering the specimen to the official monitor, who will heat seal the specimen bag in the presence of the individual being tested.

The individual being tested as well as the agency shall maintain a copy of the laboratory chain of custody form.

At the time that the urine sample is provided, the officer or supervisor, Internal Affairs investigator or supervisor, or correction officer recruit will have the option to submit two samples. Both samples will be acquired, sealed and labelled according to the procedures outlined herein. One will be forwarded to the Department of Corrections Laboratory for testing; the remaining sample will be stored in a frozen state within the Department according to departmental procedures regarding chain of custody and evidence storage procedures. The sample will be made accessible to the officer or supervisor, Internal Affairs investigator or supervisor or correction officer recruit or his attorney.

After ascertaining that all forms have been completed accurately by the officer or supervisor, Internal Affairs investigator or supervisor or correction officer recruit and serving as a witness to the void, the official monitor shall take possession of the sample and place it in a controlled access refrigerated storage area until it is delivered to the Department of Corrections Lab at Central

Office. This delivery shall occur within 24-hours of acquisition.

## LABORATORY METHOD

A state licensed toxicology laboratory currently operates within the Department's Office of Institutional Support Services, Health Services Unit. The laboratory is staffed by certified laboratory technicians, supervised clinically by a laboratory director. This laboratory is authorized to accept urine specimens for drug screening correction officers, supervisors, Internal Affairs investigators, supervisors and recruits.

The enzyme multiplied immunoassay test (EMIT) will be utilized for initial drug screening.

Confirmatory testing of specimens which show positive initial test results shall be conducted in all cases by the independent laboratory currently under contract with the Department. Gas chromatography/mass spectrometry will be used to confirm all positive results of initial drug testing procedures. In any instance where the confirmation test result is negative, the officer's sample shall be considered negative and the officer shall not be charged with use of drugs in that instance. Test results shall not be considered positive unless confirmed as such by gas chromatography/mass spectrometry.

## DRUG SCREEN RESULTS

The Department of Corrections Laboratory supervisor in Central Office will orally notify the Commissioner or designee immediately upon completion of analysis as to the results, either positive or negative. The Laboratory supervisor will follow up all oral notifications with written results to the Commissioner. All officers, supervisors, Internal Affairs investigators, supervisors, or correction officer recruits who are screened and confirmed to be positive for the presence of illegal drugs will be notified as soon as possible. A copy of the lab report will be provided to the individual upon his or her request.

## FAILURE TO PROVIDE URINE SAMPLE

In those instances where the officer, supervisor, Internal Affairs investigator, supervisor or correction officer recruit indicates that he/she is unable to provide urine sample when ordered, the individual shall be given a two hour period of time in which to provide the sample. The individual should be encouraged to consume water or other liquid and should be restricted to the area of the institution or Central Office, with the official monitor, where the sample will be voided. Failure to provide the urine specimen as required within the two (2) hour time period shall constitute a refusal.

## DISCIPLINARY ACTION

In those instances when an officer, supervisor, Internal Affairs investigator, supervisor, or correction officer recruit refuses to provide a urine sample or refuses to remain within a specified area until able to urinate, the officer, supervisor, Internal Affairs investigator, supervisor, or correction officer recruit will be subject to disciplinary charges and dismissed from employment if, after a fair and impartial hearing, it is determined that the officer, supervisor, Internal Affairs investigator, supervisor, or correction officer recruit was properly ordered to undergo testing.

Officers, supervisors, Internal Affairs investigators or supervisors, or correction officer recruits who produce positive confirmed test results indicating unlawful drug use, which are upheld after a full and impartial hearing, shall be dismissed from employment. Dismissal from employment under this circumstance will result in the individual's inclusion in a central registry maintained by the Division of State Police, to be accessed only through court order or as part of a confidential background investigation for future law enforcement employment.

In appropriate circumstances, the individual's positive confirmed test results will be reported to the County Prosecutor or the Division of Criminal Justice.

## ATTACHMENT B

### DRUG SCREENING
MEDICATION INFORMATION

In order to ensure the accuracy of established urine screening and confirmation procedures, I am providing the following information:

A. During the past 30 days I have taken the following medications prescribed to me by a physician

Name of Medication Prescribing Physician Date Last Taken
1.
2.
3.

If you do not know the exact name of medication, indicate illnesses for which medication was prescribed in space designed for name of medication.

B. During the past 30 days, I have taken the following medications (cough medicine, cold tablets, aspirin, etc.) over-the-counter medications or compounds.

Non–Prescription Medication Date Last Taken

1.
2.
3.

_____ _____
Signature of Witness Social Security and initial of applicant

_____ _____
Date Date

### EXHIBIT B

*Shoemaker v. Handel,* 795 F.2d 1136 (3d Cir.1986)

*Railway Labor Executives Ass'n v. Burnley,* 839 F.2d 575 (9th Cir.1988)

*McDonnell v. Hunter,* 809 F.2d 1302 (8th Cir.1987)

*National Treasury Employees Union v. Von Raab,* 816 F.2d 170 (5th Cir.1984), *cert. granted,* — U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988)

*Jones v. McKenzie,* 833 F.2d 335 (D.C.Cir. 1987)

*Policemen's Benevolent Association of N.J. v. Washington Twp.,* 672 F.Supp. 779 (D.N.J.1987)

*Capua v. City of Plainfield,* 643 F.Supp. 1507 (D.N.J.1986)

*Transport Workers Local 234 v. South Eastern Transportation Authority,* 678 F.Supp. 543 (E.D.Pa.1988)

*Taylor v. O'Grady* 669 F.Supp. 1422 (N.D.Ill.1987)

*Feliciano v. City of Cleveland,* 661 F.Supp. 578 (N.D.Ohio 1987), *rev'd and remanded on other grounds,* 816 F.2d 679 (6th Cir.1987).

*Rushton v. Nebraska Public Power District,* 653 F.Supp. 1510 (D.Neb.1987), *aff'd,* 844 F.2d 562 (8th Cir.1988).