We are thus satisfied that Werts is not entitled to reformation.

Affirmed.

595 A.2d 1118

IN THE MATTER OF THOMAS CALDWELL, HERBERT DOWNING, AND GERALD NEAL, PETITIONERS/APPELLANTS/CROSS–RESPONDENTS, v. NEW JERSEY DEPARTMENT OF CORRECTIONS, RESPONDENT/RESPONDENT/CROSS–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 10, 1991—Decided September 5, 1991.

594

Before Judges KING, LONG and STERN.

*Robert A. Fagella* argued the cause for appellants (*Zazzali, Zazzali, Fagella & Nowak,* attorneys).

*Robert H. Stoloff,* Assistant Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General, attorney; *Mary C. Jacobson,* Deputy Attorney General, of counsel; *Cynthia A. McCulloch* and *Rene Y. Blocker,* Deputy Attorneys General, on the briefs).

The opinion of the court was delivered by

LONG, J.A.D.

Petitioners, Thomas Caldwell, Herbert Downing and Gerald Neal, here challenge a decision of the Merit System Board (Board) affirming their termination as correction officers by the Department of Corrections (DOC) for failure to submit to drug testing. DOC cross-appeals from an award of back pay to petitioners for a period during which the Board held that their due process rights were violated. We affirm in part and reverse in part.

I

In January 1988, the Department of Corrections issued a Memorandum regarding the procedures for drug screening correction officers and other personnel. It provides:

> It is of paramount interest to this Department that employees who are responsible for the supervision, custody and care of inmates, and who are authorized to carry a firearm pursuant to 2C:39-6, are neither using nor under the influence of illicit drugs. Toward this end, the following drug screening procedures have been developed for use by this department. They are modeled after and incorporate the procedural safeguards of the law enforcement drug screening guidelines promulgated by the Attorney General of the State of New Jersey on October 22, 1986, and will become effective at the expiration of thirty (30) days.
>
> **POLICY**
>
> Urine samples shall be ordered taken from a permanently appointed correction officer or supervisor or an Internal Affairs investigator or supervisor whenever

there is individualized reasonable suspicion to believe that the officer is using or under the influence of illegal drugs.

....

**SPECIMEN ACQUISITION PROCEDURE**

A urine sample shall be ordered from a correction officer or supervisor or Internal Affairs investigator or supervisor, when there is individualized, reasonable suspicion to believe that the officer or supervisor or Internal Affairs investigator or supervisor is using or under the influence of illegal drugs. Prior to requesting that an officer or supervisor or Internal Affairs investigator or supervisor or correction officer recruit not in COTA, submit a urine sample, the department shall document the basis for reasonable suspicion and prepare a confidential report. The order to submit a urine specimen shall be given to the correction officer or supervisor or Internal Affairs Investigator or supervisor or correction officer recruit by the institution's Superintendent or designee, or in the case of Central Office custody employees, by their unit supervisor or designee, who shall document the date and time that the order was given.

The Memorandum also states that the urine sample shall not be ordered without the approval of the Commissioner, the Deputy Commissioner or the Assistant Commissioner for Adult Institutions. According to the Memorandum, if an officer, supervisor, Internal Affairs investigator, supervisor, or correction officer recruit refuses to provide the sample, he/she "will be subject to disciplinary charges and dismissed from employment if, after a fair and impartial hearing, it is determined that the officer, supervisor, Internal Affairs investigator, supervisor, or correction officer recruit was properly ordered to undergo testing." Each of the petitioners acknowledged receipt of the Memorandum on January 7, 1988.

In May 1988, Senior Investigator Barney Dyrnes of the Internal Affairs Unit at the New Jersey State Prison became involved in an investigation of the alleged widespread drug use and distribution by staff members at the prison. Investigator Dyrnes, whose responsibility it is to investigate all written and oral complaints of alleged crimes in the prison, received information in late April 1988 from a staff member at the prison (confidential "informant A") concerning the alleged use or distribution of controlled dangerous substances (CDS) by "staff members inside and outside the institution." At the time he contacted Dyrnes, informant A had discontinued his own use

and sales of CDS and came forward because "he felt he ought to" and "was concerned for the safety of other people who worked there." He told Dyrnes that based on his prior involvement with CDS, he estimated that 45 percent of the staff at the prison were involved with the use of CDS. Informant A also stated that two ex-inmates were involved in the sales and distribution of CDS with numerous staff members at the prison. He agreed to forward the information to the police and participate in the ensuing investigation. Eventually, on June 18, 1988, he supplied a written report identifying staff members who were known to be involved with CDS.

Dyrnes relayed this information to his supervisor and then to the office of the Commissioner. In June 1988, a full-scale "sting operation" was set up by the Internal Affairs Unit acting in concert with the New Jersey State Police, using staff and inmate informants, to investigate drug use and sales in the prison. As part of the investigation, Dyrnes provided a private telephone number by which inmates could contact him and also kept notes of these telephone conversations and other private conversations he had had with informants.

On August 19, 1988, the investigation had to be brought to an abrupt halt because one of the major suspects of the investigation, inmate John Bailey, died in his cell of a drug overdose. Dyrnes was informed of Bailey's death by a fellow investigator at the prison at 4:00 a.m. At approximately 8:30 a.m., Dyrnes was contacted by inmate informant B. Dyrnes told him of Bailey's death. B opined that it was due to a drug overdose and told Dyrnes that Bailey had kept his drugs in his rectum. The medical examiner was instructed to inspect Bailey's anal cavity and, as a result, found three separate packages of CDS. Informant B contacted Dyrnes again and told him that Bailey had received the drugs from Senior Correction Officer Marshall, and that the other half of that particular drug shipment had gone to inmate Fontanez. Fontanez's cell was searched and he was interviewed. Marijuana was found in a bag under the sink in his cell and cocaine, heroin, more marijuana and $35

in cash were found in a box under the cell bed. He admitted that the drugs belonged to him and that he got them from Bailey. He said that Bailey had been given half the drugs as payment for arranging to get the drugs inside the institution. Fontanez subsequently gave an additional statement detailing his extensive drug involvement with Bailey and Marshall. On that same date, Dyrnes and his supervisor, Principal Investigator Thadeus Pogorzelski, contacted Assistant Commissioner Hilton.

Hilton is one of the three individuals authorized by the DOC's drug procedures Memorandum to order a urinalysis of a staff member. Hilton had previously met with Pogorzelski concerning the drug investigation in April and was kept informed of the ongoing investigation by Chief Investigator Ira Friedman who meets with Hilton on a daily basis. Hilton was told of the inmate's death, the disclosures of informant B, the discovery of drugs in the inmate's anal cavity and in inmate Fontanez's cell and was also aware of the fact that the State Police were preparing to arrest Marshall because he had recently purchased drugs from a female undercover agent at a bar in Trenton as part of the ongoing investigation. These events, according to Hilton,

> altered things because we had a dead inmate and there were a number of legal law enforcement issues under question of which strict liability application is a term that was bantered around, which frankly I did not understand but in layman's terms was Marshall in fact if he brought the stuff in responsible for the death. How wide-spread was this? What was the potential for retaliatory, if you will, prison violence and the fact that New Jersey has a death penalty, there's a dead body, is it a homicide? It was a very, very stressful and a very major concern to me.

As a result of this concern, he called a meeting with Dyrnes, Pogorzelski, and Special Assistant Alfred Piperata (a former State Police Captain who was, at the time, serving as Special Assistant to the Commissioner overseeing implementation of the drug screening program) to review the information. Dyrnes and Pogorzelski brought several boxes of information

with them and gave Hilton a verbal briefing which lasted approximately two hours:

> Well, initially we sat down and [Pogorzelski] generally again reviewed for me the contact with the informant and the fact that drugs had been found in Bailey's rectum, the other drugs had been found and then gave me names of some 32 correction officers that were at that point targets in the investigation and then Dyrnes went through for me the cast of informants, both inmate informants and officer informants, and would identify inmate informant 21 or whatever the code name for that informant was, would give me what the slang term is the pedigree, but would give me the basis or the history or the track record of that informant insofar as making that what we would consider, what I would consider a reliable informant, that would take informant 21, this is an inmate, he's done, given us a scape, a shank, a weapon, drugs, we've confirmed prior use by federal authorities, been used by other enforcement authorities. Has done these things for us. I would in almost all cases come back, "Is he asking for anything?" "Does he, you know, does he have anything in here that would compromise his quality?" The questions would be answered and we went through the inmate informants and I was convinced that the informants that were discussed with me were reliable and creditable [*sic*] and then we went through employees, with most cases officer informants and again the question of credibility with a sworn officer is my judgment greater than it is with an inmate and I was particularly questioning what is the, what is the motivation for this employee. Is there anything that would, that would cause this employee to give such information for any self-serving purpose? For example, was there any romantic link between, you know, somebody's girlfriend or wife or is there any known hostility and again I was convinced that none of those elements were there so they were defined for me. I was shown some computer printouts of money transferrals of inmates and a variety of other documents and it took, it took every bit of two hours, I suspect, and then basically I was advised and agreed that Officer Marshall would be called to the prison that evening and that I, on the basis of individualized reasonable suspicion, was ordering that he'd give a urine and that the New Jersey State Police would place him under arrest.

When Hilton went through the list of names with Dyrnes, he was told how many informants had supplied information on each officer and whether the informants were staff, inmate, or both. Dyrnes provided Hilton with information from inmate informants only if it was corroborated with that of staff informants. Hilton did not ask Dyrnes the particular names of the informants because it would have contributed nothing to his decision-making process and because he believed their anonymity would help him to remain objective. At the conclusion of the August 19 meeting, Hilton instructed Dyrnes to prepare

a report of his investigation and the information he received. Dyrnes's report, which is dated November 15, 1988, is based on the notes he took of his private conversations with the informants. The report contains the following information with regard to Gerald Neal:

1. Staff informant A [stated] that he used CDS with Neal and arranged sales of CDS.

2. Staff informant C [stated] that he used CDS with Neal.

3. Reliable confidential inmate informant B who has provided reliable information on three previous occasions [stated] that Neal attempted to take over Marshall's drug business.

It contains the following information about Herbert Downing:

1. Staff informant A [stated] that he purchased CDS from H. Downing;

2. Staff informant C [stated] that he used CDS with H. Downing;

3. Inmate informant H who provided reliable information on two previous occasions alleged that H. Downing was also introducing CDS into the institution.

With regard to Thomas Caldwell, the report states:

1. Staff informant A [stated] he was present when T. Caldwell used CDS to include selling CDS to other staff members.

2. Reliable confidential inmate informant F who provided reliable information on nine previous occasions alleged that T. Caldwell is a main actor along with G. Neal and L. Page and L. Marshall introducing CDS into the South Compound and 4–Wing West Compound of NJSP.

3. Staff informant C [stated] that he used CDS with T. Caldwell.

Staff informant C came forward voluntarily with his allegations prior to informant A but was originally unwilling to participate in the ongoing investigation. Informant C "admitted that he was at one time addicted to cocaine and identified in excess of 80 staff members that he personally did drugs with and/or purchased [from] during his period of addiction to cocaine." According to Dyrnes, informant C approached him

[b]ecause he had cleaned his body of the drugs, he alleged, and he was seriously concerned for security and orderly running of the institution and he was worried about inmates getting hurt, staff getting hurt. The staff that weren't involved with drugs depended upon the staff who were involved with drugs. So, he knew I was actively involved in investigations in drug activity and he shared with me his knowledge of people known personally to him involved with drugs.

Dyrnes related that many of the 80 people that informant C identified were "very close friends to [informant C]." Dyrnes did not have information concerning the specific dates that informant C used drugs with petitioner Downing.

Inmate informant B was "actively involved in the sales and distribution of CDS within the security perimeter of [the prison] for several years" and informed Dyrnes of the mechanics of how the drugs were brought into the prison. Inmate informant B voluntarily approached Dyrnes and provided corroborated information to Dyrnes on those prior occasions in connection with inmate Bailey's death and the subsequent arrests of Marshall and Fontanez:

> [H]e provided the identification of a staff member involved with him in the introduction of CDS into the institution. He provided the location of CDS, a substantial amount of heroin, cocaine and a small amount of marijuana in the institution. He provided the identification of inmates who were involved in drug activity with staff, which all proved to be reliable ... [b]y staff admission, by inmate admission, and by the seizure of the CDS itself.

Inmate informant H had provided reliable information to Dyrnes on two prior occasions. He provided Dyrnes with the location of drugs hidden in the institution which led to the resignation of a staff member for drug activity. He also informed Dyrnes of pending escape attempts which were then thwarted by prison officials. He had several conversations with Dyrnes between December 1987 and August 19, 1988 in which he implicated Downing in drug activity. Dyrnes did not inform Hilton of the specific instances that Downing allegedly brought CDS into the prison.

Inmate informant F provided reliable information to Dyrnes on nine prior occasions. This involved supplying the identities of inmates and staff members involved in drugs, providing the location of drugs hidden in the institution, providing the location of weapons hidden in the institution and identifying inmates who had been involved in committing assaults in the institution.

After the meeting at Hilton's home on August 19, 1988, Pogorzelski telephoned Hilton to inform him that Marshall had been arrested, submitted a urine sample which tested positive for drug use and had made a statement. The next morning, Saturday, August 20, 1988, Hilton spoke with Piperata, went over the list of correction officers who were discussed at the meeting the previous day, and then verbally ordered Piperata to have 25 of the 32 corrections officers submit urine samples for drug screening. Petitioners were three of the officers ordered to submit to the screening.

Piperata requested Pogorzelski to assemble the Internal Affairs Unit at the prison as there was a possibility that drug screening tests would be performed. When the verbal order was issued, Piperata supplied Pogorzelski with the list of officers; Pogorzelski contacted Willis E. Morton, Associate Administrator of the prison, and Morton assembled the officers.

Once the officers were assembled, Morton read the form order to submit a urine specimen and indicated that the order had been issued by Assistant Commissioner Hilton. Once he read the order, some of the officers expressed discontent to Morton because they were not provided with any information as to the grounds on which it was based. He also recalled that some of the officers asked to speak to their attorneys and to be permitted to make a phone call. These requests were denied. The officers were told that "[i]f they left the premises then they would be considered to have refused the urine." He also testified that when an officer is ordered to submit a urine sample for drug screening, he is relieved of his duties, with pay, until the results come back and his name is posted on the "ban list" of people who are not permitted in the prison.

The petitioners were ordered to report to an Internal Affairs Unit "team" which was directed to process the paperwork involved in the screening. Each petitioner was provided with a written order to submit a specimen including a statement indicating that Hilton had determined that reasonable individu-

alized suspicion existed that that officer was either using or under the influence of illegal drugs and that the officer was ordered to submit a urine specimen. In addition, the order stated that after the specimen is obtained, the officer would be placed on leave, with pay, pending test results. If the results were positive, the officer would be placed on suspension, with pay, pending a pretermination hearing. The order also stated that if the officer refused to provide the sample, he would be placed on suspension with pay, pending a hearing. Petitioners Caldwell and Neal refused to sign the order acknowledging receipt; petitioner Downing signed the order.

Each petitioner was also provided with a form acknowledgement. The acknowledgement indicated that the officer was informed that the Department believed it had individualized reasonable suspicion that the officer may be using illegal drugs, that the officer had previously been informed of the drug screening program and the requirement to comply with the program, how the test would be conducted, the officer's rights regarding the production of the sample, and that the officer would be suspended with pay pending a hearing if the officer refused to submit a specimen. Again, petitioners Caldwell and Neal refused to sign the acknowledgement while petitioner Downing did sign it.

Each petitioner was also required to complete a drug screening medication form indicating what, if any, prescription drugs the officer was then taking and what nonprescription drugs the officer had taken in the preceding 30 days. Petitioners Caldwell and Downing completed this form, but petitioner Neal did not.

Upon completion of taking the specimen or upon the officer's refusal to provide a specimen, the Internal Affairs team prepared a summary of the procedures involving that officer. The summaries indicate that each of the petitioners refused to

submit a urine specimen.[1]

Morton issued a memorandum to each of the petitioners informing them that as a result of their refusal to submit a urine specimen as ordered, they were immediately suspended with pay pending a pretermination hearing. Morton then issued a memorandum to the shift commanders banning suspended officers from the institution.

Upon his return to his office on Monday, August 22, 1988, Assistant Commissioner Hilton memorialized the actions he took on August 20, 1988 against each of the 25 senior correction officers by personally completing drug screening authorization forms for each one. On that same day, petitioners were served with Preliminary Notices of Disciplinary Action charging them with insubordination for refusing to comply with a lawful order to submit to drug screening.

Pretermination hearings were held on August 31, 1988. At the hearings, petitioners were informed of the charges against them but were not told any of the specifics of the investigation or the bases for the Assistant Commissioner's order. At the conclusion of the hearings, petitioners were suspended without pay. Departmental hearings were held on September 29 and October 3, 1988. No additional evidence was introduced and the charges were sustained resulting in the issuance of a Final Notice of Disciplinary Action.

Petitioners filed notices of appeal with the Merit System Board pursuant to *N.J.A.C.* 4A:2–1.1 and the Board referred the matters to the Office of Administrative Law (OAL) for a consolidated determination as contested cases before an Administrative Law Judge (ALJ).

In February 1989, petitioners moved before the ALJ for discovery relating to the documentation the DOC intended to rely upon in support of its claim that it possessed a "reasonable

---

[1]Twenty-five officers were ordered to submit a urine sample; eighteen refused to comply; two failed, and five took the test and passed.

individualized suspicion" to compel each petitioner to submit to the drug test. This motion was granted and the ALJ ordered the DOC to produce the documents for his own *in camera* review. The DOC eventually produced the documents, the ALJ reviewed them, and petitioners acknowledged that they received them in time for the hearing before the ALJ.

Hearings were held before the ALJ at which the facts set forth previously were testified to by witnesses for the DOC. Each of the petitioners also testified at the hearings. Thomas Caldwell had been employed by the DOC for 12 and one-half years as a senior correction officer and has no prior disciplinary record. He testified that after Morton read the order, he requested to see an original order and to consult counsel. These requests were refused. He stated that he was aware of the drug screening procedures but was "suspicious" and felt that some explanation was necessary before he submitted to the drug test.

Gerald Neal had also been a senior correction officer at the prison for twelve and one-half years. He had one prior disciplinary action for failing to transport an AIDS patient as directed. He received a five-day suspension for this violation. Neal also testified that he asked to see a signed order and to speak with an attorney and these requests were refused. He testified that he felt he had the right to question the order and understood that he would only be compelled to submit the specimen if there was a signed order from one of the commissioners.

Herbert Downing had been a senior correction officer at the prison for seven years and had no previous disciplinary violations. He also requested to see a signed order and to speak with an attorney and these requests were denied. He was familiar with the drug testing procedures but felt that he was entitled to some explanation as to the reasons for the order. He was taking medication at the time and was concerned about the results.

Investigator Dyrnes testified that he did not retain any of the notes which were presented at his meeting with Assistant Commissioner Hilton.

The ALJ rendered an Initial Decision on November 8, 1989. He concluded that: (1) the urinalysis drug testing of correction officers is permissible under the provisions of the federal and state constitutions; (2) the Attorney General's guidelines and DOC's procedures are published statements concerning internal management and discipline which must be followed by the Department; (3) DOC complied with its procedures; (4) DOC had reasonable individualized suspicion when it ordered the petitioners to submit urine specimens for drug testing; (5) the petitioners did not need to be informed of the bases of the reasonable individualized suspicion at the time they were required to provide a urine specimen; (6) the petitioners are entitled to know the specific drug use allegations being investigated or the evidence regarding this drug use allegation at the time of the pretermination hearing; (7) because petitioners were not informed of the evidence against them at either the pretermination hearing or the departmental hearing, their due process rights were violated and the suspension without pay from the date of the pretermination hearing until the date the evidence was provided to petitioners through the OAL was constitutionally faulty and must be reversed; (8) any procedural due process violations were cured by the *de novo* OAL hearings and can be rectified by an award of back pay by the Merit System Board; (9) the petitioners were properly ordered to submit to urinalysis testing and the orders were lawful; and (10) the appropriate penalty is removal. The Merit System Board adopted the findings of fact and conclusions of law of the ALJ. This appeal ensued.

## II

The fourth amendment to the United States Constitution protects an individual against unreasonable searches and sei-

zures by government officers or those acting at their direction. Mandatory urinalysis for drug testing is a search for purposes of the fourth amendment. *Skinner v. Railway Labor Exec. Ass'n,* 489 *U.S.* 602, 617, 109 *S.Ct.* 1402, 1413, 103 *L.Ed.*2d 639, 660 (1989) ("[b]ecause it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, ... these intrusions must be deemed searches under the fourth amendment."). *Accord Harmon v. Thornburgh,* 878 *F.*2d 484, 487 (D.C.Cir.1989), *cert. denied sub nom. Bell v. Thornburgh,* —— *U.S.* ——, 110 *S.Ct.* 865, 107 *L.Ed.*2d 949 (1990); *National Treasury Employees Union v. Von Raab,* 489 *U.S.* 656, 665, 109 *S.Ct.* 1384, 1390, 103 *L.Ed.*2d 685, 701 (1989). *See, e.g., Copeland v. Philadelphia Police Dep't,* 840 *F.*2d 1139, 1143 (3d Cir.1988), *cert. denied,* 490 *U.S.* 1004, 109 *S.Ct.* 1636, 104 *L.Ed.*2d 153 (1989); *McDonell v. Hunter,* 809 *F.*2d 1302, 1307 (8th Cir.1987). *Everett v. Napper,* 833 *F.*2d 1507, 1511 (11th Cir.1987); *Amalgamated Transit Union v. Suscy,* 538 *F.*2d 1264, 1266–67 (7th Cir.), *cert. denied,* 429 *U.S.* 1029, 97 *S.Ct.* 653, 50 *L.Ed.*2d 632 (1976). This protection has been affirmed under the New Jersey Constitution, article I, paragraph 7, in *International Federation of Professional & Technical Engineers, Local 194A v. Burlington County Bridge Comm'n,* 240 *N.J.Super.* 9, 14–15, 572 *A.*2d 204 (App.Div.), *certif. denied,* 122 *N.J.* 183, 584 *A.*2d 244 (1990), and *Fraternal Order of Police v. City of Newark,* 216 *N.J.Super.* 461, 466, 524 *A.*2d 430 (App.Div.1987). *Accord Allen v. Passaic Cty.,* 219 *N.J.Super.* 352, 357–58, 530 *A.*2d 371 (Law Div.1986). *Cf. Hennessey v. Coastal Eagle Point Oil Co.,* 247 *N.J.Super.* 297, 305–06, 589 *A.*2d 170 (App. Div.1991).

▪▪▪ Petitioners contend and DOC concedes that under *Fraternal Order of Police v. City of Newark, supra,* the Attorney General's guidelines, and under DOC's drug testing procedures manual, DOC's order for drug testing must be scrutinized under the "reasonable individualized suspicion" standard. Subsequent to our holding in *Fraternal Order,* the

United States Supreme Court held that the fourth amendment was not violated even in the absence of a showing of reasonable individualized suspicion in *National Treasury Employees Union v. Von Raab, supra* (customs officials), and in *Skinner v. Railway Labor Exec. Ass'n, supra* (railroad workers who had been involved in accidents). *See also McDonell v. Hunter, supra.* Given that our constitution has been interpreted to afford greater protection to individuals than that afforded by the federal Constitution, *see State v. Novembrino,* 105 *N.J.* 95, 146, 519 *A.*2d 820 (1987); *State v. Hunt,* 91 *N.J.* 338, 370–72, 450 *A.*2d 952 (1982); *Fraternal Order, supra,* 216 *N.J.Super.* at 477, 524 *A.*2d 430, and that petitioners were informed by and acknowledged receipt of the procedures which clearly stated that they would only be ordered to submit to the test if the Commissioner found there was a "reasonable individualized suspicion," we view that standard as the applicable one. It requires objective facts which, with inferences, would lead a reasonable person to conclude that drug-related activity is taking or has taken place and that a particular individual is involved in that drug activity. It is "the sort of common sense conclusion about human behavior upon which practical people— including government officials—are entitled to rely." *Allen v. Passaic Cty., supra,* 219 *N.J.Super.* at 380, 530 *A.*2d 371 (citations omitted). Among the factors which may affect the reasonableness of the suspicion are:

(1) the nature of the tip or information;

(2) the reliability of the informant;

(3) the degree of corroboration; and

(4) other facts contributing to suspicion or lack thereof.

*Copeland v. Philadelphia Police Dep't, supra,* 840 *F.*2d at 1144 (quoting *Security & Law Enforcement Employees, Dist. Council 82 v. Carey,* 737 *F.*2d 187, 205 (2d Cir.1984)). *Accord Fraternal Order of Police, Lodge No. 5 v. Tucker,* 868 *F.*2d 74, 77–78 (3d Cir.1989).

[5] Applying this standard to the facts of this case, we are satisfied that the conclusion of the Merit System Board that

DOC's orders to submit to drug testing were based on individualized reasonable suspicion is supported by substantial credible evidence in the record and should be affirmed. *Henry v. Rahway State Prison*, 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980); *Campbell v. Department of Civil Service*, 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963).

Briefly stated, the evidence implicating Caldwell was that staff informant A stated that he was present when Caldwell used CDS and sold it to other staff members; staff informant C stated that he used CDS with Caldwell; and inmate informant F stated that Caldwell was a "main actor" in introducing CDS into the prison. The information involving Downing was that staff informant A stated that he purchased CDS from Downing; staff informant C stated that he used CDS with Downing; and inmate informant H alleged that Downing was introducing CDS into the institution. The evidence as to Neal was that staff informant A stated that he used CDS with Neal and that Neal arranged the sales of CDS; staff informant C stated that he used CDS with Neal; and an inmate informant B stated that Neal attempted to take over Senior Correction Officer Marshall's drug business.

While Investigator Dyrnes did not provide instances attesting to the reliability of the staff informants, we think that it was reasonable for him to credit their information due to the voluntariness of their approach, the risks inherent in their disclosures and the absence of a strong motive to relay falsified information. Although both informants were former drug users who may have believed that by approaching Dyrnes (before he obtained information on their own drug involvement), they could avoid future reprimand and even dismissal, these individuals risked dismissal no matter which path they chose—secrecy or disclosure. The timing of their voluntary statements is also important. Each approached Dyrnes at the inception of the investigation not at the height of it when it was discovered that an inmate who was a central figure in the drug

operations had died of a drug overdose, and an arrest was made of a senior correction officer. In addition, the staff informants were supported in the case of each petitioner by a different inmate informant.

■ With respect to the inmate informants (who petitioners claim require special scrutiny) each had previously provided reliable information to Investigator Dyrnes. Moreover, inmate informant B was specifically corroborated by the circumstances surrounding Bailey's death and by inmate Fontanez. Further, no petitioner was implicated solely by one inmate but each was also named by a staff informant. In addition, the inmate informant in each petitioner's case was a different person. In short, each petitioner was ordered to submit to the test on the basis of information from three separate sources including staff informant, whose information bore the indicia of reliability, inmates who had previously provided reliable information, and, in the case of inmate B, an informant whose testimony was corroborated in detail. This was sufficient.

### III

■ Petitioners next urge that DOC violated its own drug testing policies in ordering urine specimens from them. DOC's drug testing policy (which is based on the Attorney General's guidelines) requires the following: "Prior to requesting that an officer or supervisor or Internal Affairs investigator ... submit a urine sample, the department shall document the basis for reasonable suspicion and prepare a confidential report." Petitioners claim that this procedural requirement was not fulfilled because the confidential report was not prepared until several months after the drug tests were ordered. They contend that under *Poole v. Stephens,* 688 *F.Supp.* 149 (D.N.J.1988), a written report should have been presented to Assistant Commissioner Hilton at the time he made his decision. In *Poole,* the federal district court interpreted the DOC procedures to require "a high-level decision based upon a contemporaneous

memorandum which freezes the bases for the alleged suspicion...." 688 *F.Supp.* at 157–58. Such a requirement obviously prevents the development of individualized reasonable suspicion *after* the order is entered. While the procedure here did not meet the letter of the DOC policy, we are satisfied that under the exigent circumstances precipitated by Bailey's death and the arrest of a high-level staff member, DOC complied with the spirit of the policy. It is true that a "memorandum" was never presented to Assistant Commissioner Hilton at the time he made his decision, however, Investigator Dyrnes did present voluminous "documentation" at their meeting. The unequivocal testimony of both Dyrnes and Hilton was that Hilton was fully cognizant of all the facts as recorded in the subsequent "confidential report." In addition, the report contains the dates Dyrnes received the information during the investigation and none of the information is dated after the issuance of the orders. Dyrnes's testimony was that he informed Hilton of all the information in his notes. Given the volume of the information and the exigency of the circumstances, the subsequent documentation of this information in the "confidential report" is sufficient to support a finding that the DOC complied with the safeguarding aims of its policy.

This is not to suggest that DOC's procedure here should be followed. It should not. If in the future truly exigent circumstances occur warranting the rapid conveying of voluminous information to the Commissioner or his designee for the purpose of obtaining a drug testing order, and the pre-application preparation of a written "confidential report" is not possible because of time constraints, the evidence used to obtain the order should be transcribed either by tape or by a shorthand reporter. *Cf.* S. Pressler, *Current N.J. Court Rules,* R. 3:5–6 Comment (1991). This will operate as the mandated "confidential report," "freeze" the basis as required by *Poole,* and allay any fear of after-the-fact shoring up of the basis for the order.

## IV

Petitioners also contend that in light of their good records, and the fact that they would have complied with the order had they been given the basis for its issuance, the penalty of dismissal was too severe. DOC procedures provide that:

> In those instances when an officer ... refuses to provide a urine sample or refuses to remain within a specified area until able to urinate, the officer ... will be subject to disciplinary charges and dismissed from employment if, after a fair and impartial hearing, it is determined that the officer ... was properly ordered to undergo testing.

The ALJ concluded that the penalty was appropriate in light of the officers' "position of public trust" as law enforcement officials, the policy supporting the drug testing procedures and the inconsistency that would result if one who refuses to submit to the test was assessed a lesser penalty than those who submit and test positive. The Merit System Board adopted this conclusion with which we fully concur. Unless refusal to submit to the test is equated in terms of penalty with a positive test result, there is an incentive not to comply with a test order. Such a state of affairs would undermine the underlying purpose of testing—ferreting out drug use—and eviscerate the drug screening policy. Such a result should not be countenanced.

## V

We turn finally to the cross appeal by DOC which challenges the Merit System Board's conclusion that petitioners' due process rights were violated at their pretermination hearings warranting an award of back pay. Petitioners were provided with a pretermination hearing pursuant to *Cleveland Bd. of Educ. v. Loudermill,* 470 *U.S.* 532, 105 *S.Ct.* 1487, 84 *L.Ed.*2d 494 (1985) in which the Supreme Court held that where a public employee has a constitutionally protectible property interest in continued employment, that employee may not be terminated without first being provided with the "opportunity to present reasons, either in person or in writing, why proposed action should not be taken...." 470 *U.S.* at 546, 105 *S.Ct.* at 1495, 84 *L.Ed.*2d at

506. *Accord In re Promulgation of Guardianship Services Regulations,* 103 *N.J.* 619, 632, 512 *A.*2d 453 (1986).

Here, the ALJ found that a due process *Loudermill* violation did occur but that it was cured by the *de novo* OAL hearings and that an award of back pay would rectify the violation. As to the violation, he stated:

> In short, once the public employer decides to either suspend an officer without pay or take disciplinary action based upon an officer's refusal to submit, the Department must provide the individual officer with the specific reasons which allegedly justify the order, so that the officer can have an opportunity to rebut the reasons upon which the employer relies. That is exactly the violation which occurred here. Because it is conceded that these appellants were never told, prior to the hearing here, the reasons that allegedly formed the basis for a "reasonable individualized suspicion," they were never given an opportunity to explain why the Department's decision to order a drug test was faulty or without basis.

> Had these officers been provided at their *Loudermill* or departmental hearings with an explanation of the reasons why they had been ordered to submit to a drug test, and why they had refused, it is theoretically possible that they might have been able to convince either the Department or Assistant Commissioner Gary Hilton that there was no basis for the order or that they had legitimate reasons for refusing the order other than drug use.

The Merit System Board adopted these conclusions.

██ DOC contends that no *Loudermill* violation occurred and that even if one did, the award of back pay was unwarranted. We agree that a *Loudermill* violation occurred. No information was provided to petitioners at the pretermination and departmental hearings as to the underpinnings of Hilton's "reasonable individualized suspicion." All that petitioners were told was that they were charged with insubordination (contrary to *N.J.A.C.* 4A:2–2.3(a)(2)) due to their failure to comply with a departmental order to provide a urine sample and that the order had been issued because there existed a "reasonable suspicion" to believe that they were using or under the influence of illegal drugs. Obviously, the potential for defending against the assertion that DOC had a viable basis for issuing the order was rendered illusory by the evidential vacuum in which it was made. *Cf. In re Promulgation of Guardianship Services, supra,* Avoiding this is, to us, the point of *Loudermill.* In

reaching this conclusion, we reject so much of the holding in *Poole v. Stephens, supra,* as provides that an employer is not required to disclose the source and/or identity of the reasons for the individualized suspicion at a *Loudermill* hearing. *See also Fraternal Order of Police Lodge No. 5 v. Tucker, supra,* 868 *F.*2d at 80 (holding that where a departmental policy does not "necessitate" a discharge for failure to submit to a urinalysis and thus "[t]he appropriate discipline depends on all of the surrounding circumstances," the employee is entitled to "a sufficient explanation of the employer's evidence to permit a meaningful response."). *Loudermill* is a due process vehicle which requires in explicit terms that an employee "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." 470 *U.S.* at 546, 105 *S.Ct.* at 1495, 84 *L.Ed.*2d at 506. That did not occur here.

This is not to suggest that petitioners were necessarily entitled to every single detail of DOC's case including the identity of the witnesses against them. In an institutional setting "[f]ear of retaliation and the chilling effect which that may have upon prisoners and other corrections officers revealing an officer's drug abuse are very real concerns aggravated by the confined setting of a prison." *Poole v. Stephens, supra,* 688 *F.Supp.* at 157. Here, the institutional setting problem was exacerbated by allegations of widespread drug corruption among staff. Thus, consonant with the aim of safeguarding the staff and inmate informants and recognizing the right to a later full hearing on the subject, the information required at the *Loudermill* hearing was a general statement explaining how Hilton reached his conclusion, including the fact that unnamed staff and inmate informants had implicated petitioners. In the absence of such a statement, *Loudermill* was violated.[2]

---

[2]The institutional setting does not, in itself, eliminate the obligation of specificity at a *Loudermill* hearing. It is the fear of retaliation and the chilling effect on further reporting engendered by the institutional setting which are

## VI

The question which remains is what remedy should apply to the violation. It is here that we part company from the Merit System Board. The general statement required under *Loudermill* that petitioners had been implicated by unnamed inmates and staff would have given them no advantage above that which the actual charges gave them. Certainly, it is logical to assume from the nature of the allegations, that petitioners already knew an inside source (either an officer or an inmate informant) was involved. Thus, had they been given what *Loudermill* had entitled them to, petitioner's ability to defend would not have been improved particularly. In this respect, we view as circuitous the ALJ's conclusion that with full information, it was "theoretically possible" for petitioners to convince DOC that there was no basis for the order to submit a urine sample. After a full-blown hearing, he found that the evidence produced was sufficient to support a finding that DOC had an individualized basis upon which to issue the order. If petitioners could not convince the ALJ on a complete record that no reasonable basis existed, it is inconceivable to us that they could have fared better with DOC. Thus, we reverse the order imposing the requirement of back pay. Otherwise, we affirm.

STERN, J.A.D., concurring.

The United States Supreme Court has held that the due process clause requires "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest", *Boddie v. Connecticut*, 401 *U.S.* 371, 379, 91 *S.Ct.* 780, 786, 28 *L.Ed.*2d 113, 119 (1971) (emphasis in original), and that "[t]his principle requires some kind of a hearing prior to the discharge of an employee who has a

---

pivotal. Thus, nothing in this opinion should be viewed as limiting the obligation of *Loudermill* specificity where those factors are absent; for example, where the information against an institutional employee has been generated by an undercover officer who is no longer in the prison.

constitutionally protected property interest in his employment."
*Cleveland Bd. of Educ. v. Loudermill,* 470 *U.S.* 532, 542, 105
*S.Ct.* 1487, 1493, 84 *L.Ed.*2d 494, 504 (1985). In *Loudermill*
the Court indicated that the hearing "though necessary, need
not be elaborate." 470 *U.S.* at 545, 105 *S.Ct.* at 1495, 84
*L.Ed.*2d at 506. "[T]he formality and procedural requisites for
the hearing can vary, depending upon the importance of the
interests involved and the nature of the subsequent proceed-
ings." *Id.,* quoting *Boddie v. Connecticut, supra,* 401 *U.S.* at
378, 91 *S.Ct.* at 786, 28 *L.Ed.*2d at 119. "In general, 'some-
thing less' than a full evidentiary hearing is sufficient prior to
adverse administrative action." *Loudermill, supra,* 470 *U.S.*
at 545, 105 *S.Ct.* at 1495, 84 *L.Ed.*2d at 506.

> ... [T]he pretermination hearing need not definitively resolve the propriety of
> the discharge. It should be an initial check against mistaken decisions—
> essentially, a determination of whether there are reasonable grounds to believe
> that the charges against the employee are true and support the proposed action.
>
> \*       \*       \*       \*       \*       \*       \*       \*
>
> The essential requirements of due process, and all that respondents seek or
> the Court of Appeals required, are notice and an opportunity to respond. The
> opportunity to present reasons, either in person or in writing, why proposed
> action should not be taken is a fundamental due process requirement.... The
> tenured public employee is entitled to oral or written notice of the charges
> against him, an explanation of the employer's evidence, and an opportunity to
> present his side of the story.... To require more than this prior to termination
> would intrude to an unwarranted extent on the government's interest in quickly
> removing an unsatisfactory employee. [*Id.,* 470 *U.S.* at 545–546, 105 *S.Ct.* at
> 1495, 84 *L.Ed.*2d at 506. (citations omitted)].

Because of security interests and fears attendant to the
discovery of information obtained confidentially from inmate
informants, disciplinary proceedings in the prison setting have
always been treated differently than in other contexts. *See
e.g., Wolff v. McDonnell,* 418 *U.S.* 539, 94 *S.Ct.* 2963, 41
*L.Ed.*2d 935 (1974); *Avant v. Clifford,* 67 *N.J.* 496, 341 *A.*2d
629 (1975). This is not the occasion to decide the application of
*Loudermill* in the prison setting, its scope or the degree to
which, if at all, the due process rights afforded by *Loudermill*
require discovery by a corrections officer of confidential infor-
mation in order to respond to the charges noticed based on his

insubordination in failing to take the drug test.[1]  This is particularly true because this case involves a violation of the department's own regulations and procedures which provide that:

> In those instances when an officer ... refuses to provide a urine sample or refuses to remain within a specified area until able to urinate, the officer ... will be subject to disciplinary charges and dismissed from employment if, *after a fair and impartial hearing*, it is determined that the officer ... was properly ordered to undergo testing.  (emphasis added).

Further, as the majority notes, the petitioners were told at the time they were directed to take the exam that "[i]f the officer refused to provide the sample, he would be placed on suspension with pay, pending a hearing."  At 604, 595 *A.*2d at 1124. Therefore, and because I agree with the court's conclusion on the cross-appeal as developed in Point VI of the opinion, I find it unnecessary to consider the constitutional issues developed in Point V.  Specifically, I find it unnecessary to "reject so much of the holding in *Poole v. Stephens,* [688 *F.Supp.* 149 (D.N.J.1988)] as provides that an employer is not required to disclose the source and/or identity of the reasons for the individualized suspicion at a *Loudermill* hearing."  At 615, 595 *A.*2d at 1129.  To the contrary, if we had to address those issues, I would be inclined to agree with Judge Bissell's analysis of the *Loudermill* issue relative to the same procedures involved in this case (see 688 *F.Supp.* at 151–154;  facts 12, 29 and 35):

> Fear of retaliation and the chilling effect which that may have upon prisoners and other corrections officers revealing an officer's drug abuse are very real concerns aggravated by the confined setting of a prison.  The fourth amendment principles do not require disclosure of the grounds and sources of information to one about to be subjected to an otherwise reasonable search and seizure ...  The codified procedures, which require a high-level decision based upon a contemporaneous memorandum which freezes the bases for the alleged suspicion, provide protection to the corrections officers.  Although source

---

[1] I recognize that there is a difference between discipline of prisoners and corrections officers, but in both instances the case can be based in whole or part on confidential information received from an inmate informer.  The concern about retaliation upon disclosure may be greater when the informer is an inmate living in the prison with the person disciplined.

disclosure is not required at the *Loudermill* hearing, it will inevitably be required if an officer invokes his right to further, formal hearings and judicial review. These post-termination hearings satisfy due process requirements. [688 *F.Supp.* at 157–158 (footnote omitted) ].[2]

Subject to the caveats expressed above, I join the court's opinion.

[2]I need not address herein the scope of discovery at the post-termination hearing. However, I tend to believe that the ultimate "source disclosure" whenever required may frequently be satisfied by reference to "unnamed staff and inmate informants." (majority at 615, 595 *A.2d* at 1130).