841 A.2d 94

FREDERICK HAMILTON, PETITIONER–APPELLANT, v.
NEW JERSEY DEPARTMENT OF CORRECTIONS,
RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted December 2, 2003—Decided January 28, 2004.

Before Judges STERN, A., A. RODRÍGUEZ and PAYNE.

*Frederick Hamilton,* appellant pro se.

*Peter C. Harvey,* Attorney General, attorney for respondent (*Michael J. Haas,* Assistant Attorney General, of counsel; *Nicole Schreiner,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

PAYNE, J.A.D.

Petitioner Frederick Hamilton, a convicted prison inmate, was the subject of an unsigned "snitch" note stating that he and another inmate had been observed injecting heroin. He was ordered to give a urine sample, which tested positive for opiates. Hamilton was charged with the commission of prohibited act *.204, use of a prohibited substance (*see N.J.A.C.* 10A:4–4.1(a)), and he pled guilty to the charge. Although his initial sanction was

higher, following a plea for leniency, Hamilton received ninety days of administrative segregation, fifteen days of detention with credit for time served, 180 days' loss of commutation credits, permanent loss of contact visits, and ninety days of urine monitoring. Hamilton appeals.

On appeal, Hamilton claims that reasonable individualized suspicion sufficient to require urine testing was not provided by the snitch note and thus that evidence of his drug use, consisting of the urine specimen, should have been suppressed. We note initially that Hamilton did not raise this issue at his disciplinary hearing, but instead pled guilty to the offense. A motion in the Superior Court for suppression based on an unlawful search and seizure survives a guilty plea. *State v. Greeley,* 178 *N.J.* 38, 50–51, 834 *A.*2d 1016 (2003); *R.* 3:5–7(d). Because in this administrative proceeding, no motion was made, Hamilton's claim of unlawfulness may have been waived. *Cf. State v. Johnson,* 365 *N.J.Super.* 27, 33–34, 837 A.2d 1131 (App.Div.2003). However, it is unnecessary for us to determine whether waiver exists in this context as the result of our substantive resolution of the issues raised.

Hamilton's argument fails on substantive grounds. A state-compelled urinalysis constitutes a search and seizure for purposes of the Fourth Amendment. *Joye v. Hunterdon Central H.S.,* 176 *N.J.* 568, 589–95, 826 *A.*2d 624 (2003); *New Jersey Transit PBA Local 304 v. New Jersey Transit Corp.,* 151 *N.J.* 531, 543, 701 *A.*2d 1243 (1997); *Rawlings v. Police Dep't of Jersey City,* 133 *N.J.* 182, 188, 627 *A.*2d 602 (1993); *O'Keefe v. Passaic Valley Water Comm'n,* 132 *N.J.* 234, 242 (1993); *Caldwell v. Dept. of Corrections,* 250 *N.J.Super.* 592, 608, 595 *A.*2d 1118 (App.Div.), *certif. denied,* 127 *N.J.* 555, 606 *A.*2d 367 (1991); *Fraternal Order of Police v. City of Newark,* 216 *N.J.Super.* 461, 466, 524 *A.*2d 430 (App.Div.1987). *See also, e.g., Skinner v. Railway Labor Exec. Ass'n,* 489 *U.S.* 602, 617, 109 *S.Ct.* 1402, 1413, 103 *L.Ed.*2d 639, 660 (1989) ("[b]ecause it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long

recognized as reasonable, ... these intrusions must be deemed searches under the fourth amendment."); *National Treasury Employees Union v. Von Raab,* 489 *U.S.* 656, 665, 109 *S.Ct.* 1384, 1390, 103 *L.Ed.*2d 685, 701–02 (1989); *Spence v. Farrier,* 807 *F.*2d 753, 755 (8th Cir.1986). *Cf. Schmerber v. California,* 384 *U.S.* 757, 767–68, 86 *S.Ct.* 1826, 1834, 16 *L.Ed.*2d 908, 917–18 (1966) (compulsory blood alcohol test). *Compare Hudson v. Palmer,* 468 *U.S.* 517, 527–28, 104 *S.Ct.* 3194, 3200–01, 82 *L.Ed.*2d 393, 404 (1984) (no right of privacy extends to the contents of a convicted inmate's cell, and a search thereof is not subject to the Fourth Amendment).

However, we find by use of a "special needs" test that neither the federal nor the New Jersey constitution requires that probable cause or reasonable suspicion be demonstrated prior to requiring that a urine specimen be given by a prison inmate on a nonrandom basis following receipt of an anonymous tip. *Cf. Bell v. Wolfish,* 441 *U.S.* 520, 558–60, 99 *S.Ct.* 1861, 1884–85, 60 *L.Ed.*2d 447, 480–82 (1979) (permitting visual body cavity searches of pretrial detainees after every contact visit with a person from outside the institution, without the necessity of a showing of probable cause). As the Court stated there, the Fourth Amendment precludes only "unreasonable" searches. *Id.* at 558, 99 *S.Ct.* at 1884, 60 *L.Ed.*2d at 481.

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.
>
> [*Id.* at 559, 99 *S.Ct.* at 1884, 60 *L.Ed.*2d at 481.]

Utilizing this analysis, we have permitted the use of Ion Scan machines and dogs to determine whether prison visitors are carrying drugs, without imposing a requirement that individualized suspicion trigger that use. *Jackson v. Dept. of Corrections,* 335 *N.J.Super.* 227, 232–35, 762 *A.*2d 255 (App.Div.2000), *certif. denied,* 167 *N.J.* 630, 772 *A.*2d 932 (2001). In doing so, we stated:

> Inmates do not shed all of their constitutional rights at the prison gate. There is no iron curtain drawn between the Constitution and New Jersey prisoners. *See New Jersey State Parole Bd. v. Byrne,* 93 *N.J.* 192, 460 *A.*2d 103 (1983); *Avant v. Clifford,* 67 *N.J.* 496, 341 *A.*2d 629 (1975). While these principles can be articulated with disarming ease, our effort to define the metes and bounds of an inmate's constitutional protections requires an "intricate balancing of prison management concerns with prisoner's liberty." *Sandin v. Conner,* [515 *U.S.* 472, 478, 115 *S.Ct.* 2293, 2297, 132 *L.Ed.*2d 418, 426 (1995)] (citing *Wolff v. McDonnell,* 418 *U.S.* 539, 556–58, 94 *S.Ct.* 2963, 2974–76, 41 *L.Ed.*2d 935, 950–52 (1974)). "Prisons are dangerous places." *Blyther v. New Jersey Dept. of Corrections,* 322 *N.J.Super.* 56, 65, 730 *A.*2d 396 (App.Div.1999). The courts must afford appropriate deference and flexibility to corrections officers trying to manage a volatile environment. *Ibid.* (citing *Wolff v. McDonnell,* 418 *U.S.* at 561–63, 94 *S.Ct.* at 2977–78, 41 *L.Ed.*2d at 954–55). Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life. *Ibid.*
>
> [*Jackson, supra,* 335 *N.J.Super.* at 232–33, 762 *A.*2d 255.]

We then recognized in *Jackson* that the United States Supreme Court has not imposed probable cause and warrant requirements where "special needs, beyond those normally associated with law enforcement, have been shown to make any other course impracticable." *Id.* at 234, 762 *A.*2d 255 (quoting *Griffin v. Wisconsin,* 483 *U.S.* 868, 107 *S.Ct.* 3164, 3168, 97 *L.Ed.*2d 709, 717 (1987)) (quoting *New Jersey v. T.L.O.,* 469 *U.S.* 325, 351, 105 *S.Ct.* 733, 748, 83 *L.Ed.*2d 720, 741 (1985) (Blackmun, J., concurring)). When "special needs" exist, the individual's privacy expectations must be balanced against the government's interests in determining whether some level of individualized suspicion is required in a particular context. *Jackson, supra,* 335 *N.J.Super.* at 234, 762 *A.*2d 255 (citing *Von Raab, supra,* 489 *U.S.* at 665–66, 109 *S.Ct.* at 1390–91, 103 *L.Ed.*2d at 702 and *Skinner, supra,* 489 *U.S.* at 619, 109 *S.Ct.* at 1414, 103 *L.Ed.*2d at 661 (1989)). "We determine whether the asserted governmental interest 'justifies the privacy intrusions at issue absent warrant or individualized suspicion.'" *Jackson, supra,* at 235, 762 A.2d 255 (quoting *Skinner, supra,* 489 *U.S.* at 621, 109 *S.Ct.* at 1415, 103 *L.Ed.*2d at 662–63).

In *Jackson* we found that the balance between the lesser expectations of privacy harbored by one entering a prison as a visitor and the institutional need to control the flow and use of drugs favored institutional security and rendered the procedures

employed to scan visitors reasonable under a Fourth Amendment analysis. *Jackson, supra,* 335 *N.J.Super.* at 235, 762 *A.*2d 255.

Although New Jersey does not appear to have addressed the specific issue, other courts have determined through use of the balancing test that we have described that random tests for drugs in prison through the use of convicted inmates' urine samples does not offend the Fourth Amendment. *See, e.g., Lucero v. Gunter,* 17 *F.*3d 1347, 1350 (10th Cir.1994) (authorizing random urine collection if it was truly based on random selection or was otherwise permissible under the Fourth Amendment as applied to prisoners); *Forbes v. Trigg,* 976 *F.*2d 308, 313 (7th Cir.1992), *cert. denied,* 507 *U.S.* 950, 113 *S.Ct.* 1362, 122 *L.Ed.*2d 741 (1993); *Spence, supra,* 807 *F.*2d at 755; *Ramey v. Hawk,* 730 *F.Supp.* 1366, 1369–70 (E.D.N.C.1989); *Storms v. Coughlin,* 600 *F.Supp.* 1214, 1221 (S.D.N.Y.1984) (permitting such searches if carried out in a reasonable, nonharassing manner). As stated by the court in *Lucero,*

> The unauthorized use of narcotics in a [prison] by inmates does pose a serious threat to prison officials' ability to maintain institutional security. *Cf. Block v. Rutherford,* 468 *U.S.* 576, 588–89, 104 *S.Ct.* 3227, 3233–34, 82 *L.Ed.*2d 438 (1984) (indicating the unauthorized use of narcotics is a problem in many penal and detention centers). Consequently, prison officials have a "significant and legitimate" interest in preventing unauthorized drug use among prison inmates. We therefore hold that the random urine collection and testing of prisoners is a reasonable means of combating the unauthorized use of narcotics and does not violate the Fourth Amendment.
>
> [*Lucero, supra,* 17 *F.*3d at 1350.]

In addition, at least one court has held that probable cause for non-random urine testing of prison inmates for drugs is not required. *See Pella v. Adams,* 638 *F.Supp.* 94, 98 (D.Nev.1986). *Cf. also Strauch v. Demskie,* 892 *F.Supp.* 503, 506–07 (S.D.N.Y. 1995) (granting qualified immunity to prison official in prisoner's § 1983 action on the ground that it was not clearly established that reasonable suspicion must exist to support a non-random urine test for drugs).

When analyzing challenges by police and corrections officers to drug testing, we have in two instances required as a matter of state constitutional law that reasonable individualized suspicion be

demonstrated. *See Caldwell, supra,* 250 *N.J.Super.* at 609, 595 *A.*2d 1118; *Fr. Order of Police, supra,* 216 *N.J.Super.* at 470–78, 524 *A.*2d 430. However, as we recognized in *In re J.G.,* 289 *N.J.Super.* 575, 592–93, 674 *A.*2d 625 (App.Div.1996), a case upholding statutes requiring mandatory HIV testing of sexual offenders against state and federal constitutional challenge, neither of those two decisions required an analysis of "whether the 'special needs' test, which does not require the State to demonstrate a 'reasonably individualized suspicion,' is compatible with our state constitutional guarantees." *Ibid.* We also noted in *J.G.* that in *Local 194A v. Burlington County Bridge Comm'n,* 240 *N.J.Super.* 9, 572 *A.*2d 204 (App.Div.), *certif. denied,* 122 *N.J.* 183, 584 *A.*2d 244 (1990) we had employed a "special needs" analysis to the constitutionality of mandatory drug testing of public employees involved in operating the bridges spanning the Delaware River and found, after balancing the privacy concerns of the affected employees against public safety, that such testing violated neither state nor federal constitutional protections, which we found to be co-extensive in this context. *Id.* at 24–25, 572 *A.*2d 204.

Moreover, in *PBA Local 304, supra,* 151 *N.J.* at 547–58, 701 *A.*2d 1243, the New Jersey Supreme Court specifically adopted the "special needs" test articulated in *Skinner, supra,* 489 *U.S.* at 602, 109 *S.Ct.* at 1402, 103 *L.Ed.*2d at 639 and *Von Raab, supra,* 489 *U.S.* at 656, 109 *S.Ct.* at 1384, 103 *L.Ed.*2d at 685 [1] in sustaining the constitutionality of random urine drug testing of armed Transit police officers under Article 1, Paragraph 7 of the New Jersey Constitution. *See also Joye, supra,* 176 *N.J.* at 595, 826 *A.*2d 624 (adopting special needs test in analyzing challenge on state constitutional grounds to random suspicionless urine drug testing of students involved in extracurricular activities); *Hennessey v. Coastal Eagle Point Oil Co.,* 129 *N.J.* 81, 99–108, 609 *A.*2d 11 (1992) (applying a balancing approach to drug testing of oil

---

[1] *See also, Vernonia School Dist. 47J v. Acton,* 515 *U.S.* 646, 115 *S.Ct.* 2386, 132 *L.Ed.*2d 564 (1995) and *Chandler v. Miller,* 520 *U.S.* 305, 117 *S.Ct.* 1295, 137 *L.Ed.*2d 513 (1997).

refinery employees); *State v. Hempele,* 120 *N.J.* 182, 218–21, 576 *A.*2d 793 (1990) (rejecting "special needs" as rationale for warrantless search of garbage). *Cf. O'Keefe v. Passaic Valley Water Comm'n.,* 132 *N.J.* 234, 242–45, 624 *A.*2d 578 (1993)(discussing "special needs" analysis in dictum). The Court held in *PBA Local 304* that, "[t]o the extent that *FOP* is inconsistent with the special needs test ... it is overruled." *Id.* 151 *N.J.* at 558, 701 *A.*2d 1243.

In the present case we find, as we did in *Jackson,* that "special needs," beyond those normally associated with law enforcement, exist as the result of the necessity of curtailing the use of illegal drugs in state prisons in order to preserve order, safety and the health of the inmate population, and that those needs rendered reasonable the procedures adopted by the prison officials in identifying Hamilton as a potential drug offender and requiring that he give a urine sample. In reaching this conclusion, we have undertaken "a context-specific inquiry, examining closely the competing private and public interests advanced by the parties" and have assessed "the practicality of the warrant and probable-cause requirements" in the context presented. *PBA Local 304, supra,* 151 *N.J.* at 548, 701 *A.*2d 1243 (quoting *Chandler v. Miller,* 520 *U.S.* 305, 313–14, 117 *S.Ct.* 1295, 1301, 137 *L.Ed.*2d 513, 523 (1997)). In this analytical context we note our previous recognition that "urinalyses are commonplace in these days of periodic physical examinations and do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity." *State v. Malik,* 221 *N.J.Super.* 114, 122, 534 *A.*2d 27 (App. Div.1987). We also note our prior recognition of the dangers inherent in the presence of drugs in a prison environment and the need for prompt interdiction of drug use. *Jackson, supra,* 335 *N.J.Super.* at 233–34, 762 *A.*2d 255. Further, we find the requirement of probable cause, or even showing of reasonable suspicion prior to drug testing to be impractical in this prison context. In the circumstances of this case, we thus find that the privacy concern that we have identified is far outweighed by legitimate concerns for institutional security and safety that demand the adoption of procedures akin to those utilized by the prison officers

here. We thus find no constitutional infirmity in the utilization of an anonymous tip as the basis for ordering that a convicted and incarcerated felon submit to a urinalysis to determine whether drug use has occurred. We find such a procedure to be reasonable in the circumstances, even in the absence of individualized suspicion or probable cause.

Affirmed.